IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MIKHAIL VENIKOV )
)
    Plaintiff, )
)
v. )  Case No. 2:17-cv-00030
)  Judge Crenshaw / Frensley
THURMAN'S USED CARS, ROBERT E. )
THURMAN II, AND ROBERT JOSHUA )
THURMAN, )
)
    Defendants. )

## REPORT AND RECOMMENDATION

### I. Introduction and Background

This matter is before the Court upon a Motion to Dismiss filed by pro se Defendant Robert Thurman II, the body of which states in its entirety as follows:

> Pursuant to 16(b) Rules, Defendant hereby moves the Court to dismiss Plaintiff's Complaint with prejudice. The bases for this motion are set forth in the accompanying memorandum.[1]
>
> 1. Plaintiff Mikhail Venikov come to Thurman's Used Cars on September 7 2016. Plaintiff looked car over he was purchasing and after completing inspection he paid remaining balance owed and signed Bill of Sale agreeing to the terms to complete the purchase. (See Bill of Sale).[2]
>
> 2. In Tennessee according to the legal aspect the Seller is not responsible to pay for work done on a car by the buyer when a car is sold "As Is" with "No Warranty". If the Buyer who is Mikhail wants to have work done to his car it is not the

---

[1] Defendant did not, however, file an accompanying memorandum.

[2] Defendant attached what purports to be an unauthenticated copy of a "Used Vehicle Order.".

> responsibility of the Seller to pay for his decisions to do whatever
> he decides to his vehicle.
>
>     3. Plaintiff Mikhail Venikov bought car, he then decides he
> wants to sell it back to Thurman's Used Cars, (which we were
> willing to do for the price he paid). Now, the Plaintiff Mikhail
> Venikov has decided again that he wants to keep car!
>
>     In conclusion, Thurman's Used Cars feels these are reasons
> for dismissal. Mikhail Venikov the Plaintiff come to the place of
> business and inspected car before he paid for it. He made a clear
> conscience decision that he agreed to the contract and condition of
> car that he was purchasing.

Docket No. 23 (footnotes added).

As has been noted, Defendant did not file an accompanying Memorandum of Law.

Plaintiff has filed a Response in Opposition to Defendant's Motion arguing first that Defendant's Motion should be denied because it is an improper pleading that is procedurally defective. Docket No. 24. Plaintiff additionally argues that Defendant's Motion should be denied because, taking the allegations of Plaintiff's Complaint as true, Plaintiff's Complaint has sufficiently alleged four different causes of action for which relief may be granted, such that dismissal is inappropriate. *Id.* Third, Plaintiff argues that, to the extent that the Court may view Defendant's Motion as a Motion for Summary Judgment, granting that Motion would be inappropriate because genuine issues of material fact exist such that summary judgment is precluded. *Id.*

For the reasons set forth below, the undersigned recommends that Defendant's Motion to Dismiss (Docket No. 23) be DENIED.

## II. Factual Averments of Plaintiff's Complaint

Plaintiff initially had an agreement with a company called Cooper's Classic in Terre

Haute, Indiana in 2014 to restore his 1967 Mustang shell (composed of one piece which includes the quarter panels, hood, trunk, and doors), but Cooper's Classic went out of business because the owner was arrested. Docket No. 1, ¶ 14. After Cooper's Classic went out of business, the Plaintiff's car was taken to the Terre Haute, Indiana police department and left there. *Id.*, ¶ 15. Subsequently, in the beginning of 2016, Plaintiff found Thurman's Used Cars online. *Id.*, ¶ 16. Soon after he found the company online, the Plaintiff called the Defendants, and Plaintiff and Defendants entered into an oral agreement for Defendants to pick up Plaintiff's shell at the police station in Terre Haute, Indiana, and for Defendants to restore Plaintiff's 1967 shell for $50,000.00. *Id.*, ¶ 17. Before obtaining possession of Plaintiff's shell, Defendants initiated a change in the agreement. *Id.*, ¶ 18. They asked Plaintiff if he would rather purchase a restored 1968 Mustang shell owned by Defendants, as it would take less time to restore the 1968 Mustang shell into an Eleanor replica from the movie "Gone in 60 Seconds." *Id.* The Plaintiff and the Defendants entered into an agreement in May of 2016 wherein Plaintiff was purchasing a 1968 Ford Mustang Eleanor replica with "new glass all way and rubbers everything new" from the Defendants in exchange for a $10,000.00 down payment, an additional $30,000.00, and the title to his 1967 Mustang shell valued at $10,000.00. *Id.*, ¶ 19; Ex. 1. Plaintiff paid Defendants the $10,000.00 down payment through a Bank of America wire transfer in May of 2016. *Id.*, ¶ 20; Ex. 2.

Defendant Joshua Thurman sent another text message to Plaintiff in May of 2016 stating: "One thing we do is always do buyer a promise to get there money back and sale cause have plenty of buyers wanting when done they just don't like to wait so easy to sell have buyers ready if needed get money back." *Id.*, ¶ 21; Ex. 3. In the same month, Defendants represented to

3

Plaintiff that the 1968 Mustang shell would be restored to look like an Eleanor and have very similar attributes, including the seats, dashboard, rims, etc. *Id.*; ¶ 22; Ex. 4.

Defendants picked up Plaintiff's car from the Terre Haute police department in June 2016 and told Plaintiff that the Eleanor replica would be ready by July or August 2016. *Id.*, ¶ 23. While working on Plaintiff's car, Defendant Joshua Thurman sent Plaintiff a text message that said, "You a get your money's worth cause we ant sold a car yet that the other person couldn't make money on also." *Id.*, ¶ 24; Ex. 5.

Plaintiff flew to Tennessee in September 2016 to find out if the Defendants were making progress with Plaintiff's Eleanor replica. *Id.*, ¶ 25. Plaintiff spent about $1,250.00 to fly from California to Defendants' shop in Tennessee, including airfare and lodging. *Id.*, ¶ 26.

While Plaintiff was visiting Defendants' shop in September 2016, Defendant Robert Thurman II showed Plaintiff the 1968 vehicle that they were restoring for Plaintiff to be an Eleanor replica, and Plaintiff was unhappy with the condition of the vehicle. *Id.*, ¶ 27. Plaintiff expressed that he was unhappy with the condition of the vehicle, and Defendants gave him a marker to circle defects on the vehicle. *Id.*, ¶ 28. Plaintiff circled and pointed out many defects on the vehicle, including but not limited to: runs in the paint all throughout the car, bubbles and chipped pain, rust underneath the car near the gas tank, wires sticking out under the hood, and used interior materials. *Id.*, ¶ 29. Additionally, the doors of the car would not close because they were not aligned properly. *Id.*, ¶ 30. Defendants represented to Plaintiff that all the above defects on his car would be fixed before delivery, and that they had just hired a new mechanic because they had fired the mechanic who was previously working on his vehicle. *Id.*, ¶ 31. Defendants additionally represented to Plaintiff that the back seat, the dashboard, the gauges, and

4

the entire interior would be new once the vehicle was finished. *Id.*, ¶ 32.

Defendants then showed Plaintiff a different and well-restored Ford Mustang Eleanor replica in their shop which looked perfect - with all new interior, new paint, a rebuilt engine, etc. *Id.*, ¶ 33. Defendants represented to Plaintiff that he should not be concerned because his vehicle would look exactly like the well-restored replica when Defendants finished their work. *Id.*, ¶ 34. Defendant told Plaintiff that Plaintiff's vehicle would be restored like the Ford Mustang Eleanor in the movie "Gone in 60 Seconds." *Id.*, ¶ 35. Plaintiff told Defendants that he would rather Defendants extend the time frame and restore the car properly than rush the restoration job, but Defendants said they would stick to the extended time frame of October. *Id.*, ¶ 36. Plaintiff therefore paid Defendants $30,000.00, signed the Used Vehicle Order form and Certificate of Title Extension Form on September 7, 2016 for the Eleanor Replica. *Id.*, ¶ 37; Ex. 6.

Defendants requested an additional $500.00 from Plaintiff, after Plaintiff's visit to Tennessee in September, to finish the Eleanor replica by October. *Id.*, ¶ 38. Defendant asked Plaintiff in a text message to wire the money to an account named "Dale Hollow Mustang" and Plaintiff wired the $500.00 on September 8, 2016. *Id.*, ¶ 39; Ex. 7.

Defendants represented to Plaintiff that Plaintiff's car would conform to certain specifications and would look like the vehicle Defendants showed Plaintiff in their shop. *Id.*, ¶ 40.

In October of 2016 Defendants delivered the vehicle to Plaintiff in California. *Id.*, ¶ 41. Plaintiff paid Sunstate Auto Transport Inc. $1,400.00 to deliver the vehicle. *Id.*, ¶ 42; Ex. 8. When Plaintiff received the vehicle, he immediately realized it was not in the condition Defendants had promised. *Id.*, ¶ 43. The doors of the vehicle would not close all the way, the

5

paint was chipping in numerous places, there were paint runs, the interior was old, and there was rust underneath the car. *Id.*, ¶ 44. Plaintiff is not sure whether Defendants delivered the same defective car Defendants showed Plaintiff in September, but it is possible. *Id.* The vehicle Plaintiff received was not safe to drive. *Id.*, ¶ 45. It appeared that the vehicle had been in an accident, and the electrical wiring indicated that the vehicle had been in a fire. *Id.* Plaintiff immediately had the vehicle towed to a body shop. *Id.*, ¶ 46.

Plaintiff received an estimate from Rowdy Rods and Classics, LLC, to fix the vehicle for a total of $48,690.00, for work including collision repair, disassembly, body work, body assembly, and electrical work. *Id.*, ¶ 47; Ex. 9. Plaintiff paid Rowdy Rods and Classics, LLC $15,915.00 since receiving the vehicle in order to make the vehicle safe to drive. *Id.*, ¶ 48; Ex. 10.

Plaintiff called Robert Thurman II the day he received the car and told him he received the car and the car looked horrific, and Robert Thurman II hung up. *Id.*, ¶ 49. Plaintiff left Robert Thurman voicemails and text messages with pictures of the dilapidated vehicle from the time he received it in October of 2016 until December 2016. *Id.*, ¶ 50. He asked Defendants to call him and told them the condition of the vehicle, but he never received a response. *Id.*; Ex. 11.

Plaintiff reached out to the Sheriff's Department in Celina, Tennessee, and told the deputy he wanted his money back. *Id.*, ¶ 51. The deputy's advice after speaking to Defendants was for Plaintiff to hire an attorney. *Id.*, ¶ 52.

### III. Law and Analysis

#### A. Motions to Dismiss

Although Plaintiff cites as grounds for his Motion "16(b) Rules," Motions to Dismiss for

6

failure to state a claim are governed by Fed. R. Civ. P. 12(b)(6). Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.* A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id.* At 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has recently addressed the appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

7

Case 2:17-cv-00030   Document 26   Filed 11/28/18   Page 7 of 9 PageID #: 343

> complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

556 U.S. at 678-79 (citations omitted).

### B. The Case at Bar

Taking the well-pled allegations of Plaintiff's Complaint as true, as the Court must do at this stage of the proceedings, Plaintiff's Complaint "contain[s] either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Mezibov*, 411 F.3d at 716. In fact, Plaintiff has pled allegations under four viable legal theories: Intentional Misrepresentation, Negligent Misrepresentation, Violation of Tennessee Consumer Protection Act, and Breach of Contract. Accordingly, Plaintiff's claims should be permitted to proceed, and Defendant's Motion to Dismiss should be denied.

### IV. Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's Motion to Dismiss (Docket No. 23) be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

8

_____
JEFFERY S. FRENSLEY
United States Magistrate Judge

9